***********
Upon review of the competent evidence of record with reference to the errors assigned, and finding no good grounds to receive further evidence or to rehear the parties or their representatives, the Full Commission adopts with minor modifications the Opinion and Award of the Deputy Commissioner.
 ***********
The Full Commission finds as fact and concludes as matters of law the following which were entered into by the parties in a Pre-Trial Agreement and at the hearing before the Deputy Commissioner as:
 STIPULATIONS
1. It is stipulated that all parties are properly before the Commission, and that the employment of plaintiff in this action was and is subject to the jurisdiction of the Industrial Commission of North Carolina pursuant to the Workers' Compensation Act.
2. Perdue Farms, Inc. was and is a qualified, self-insured employer under the Act, and carried the risk at all times relevant to this claim.
3. Plaintiff was employed by Perdue Farms, Inc., from 1 March 1985 to 9 September 1997 in its Lewiston, North Carolina poultry processing plant.
4. Crawford Co., Inc. was and is the servicing agent for Perdue Farms, Inc. at all times relevant to this claim.
5. The parties stipulate that the following documents are authentic and genuine and may be received into evidence, without further identification or verification:
 • Plaintiff's Exhibit 1 Form 18 dated 23 January 1999 and filed with the Commission in January 1999 in this case;
 • Plaintiff's Exhibit 2 Form 19 dated 16 April 1996 and filed with the Commission in April 1996 in this case;
• Plaintiff's Exhibit 3 Form 61 dated 3 August 1999;
 • Plaintiff's Exhibit 4 Form 22s (3 pages) for plaintiff's employment by Perdue Farms, Inc. dated 29 October 1999 for the time period from 5 April 1996 to the present date;
 • Plaintiff's Exhibit 5 Form 22 dated 23 September 1999 for plaintiff's employment by Perdue Farms, Inc. from 5 April 1995 to 5 April 1996;
 • Plaintiff's Exhibit 6 Outside of Perdue Personnel File Jacket for plaintiff (2 pages);
 • Plaintiff's Exhibit 7 Perdue Farms, Inc. Profile Document of plaintiff for termination of plaintiff's employment on 9 September 1997;
 • Plaintiff's Exhibit 8 — Associate Attendance History for plaintiff's employment with Perdue Farms, Inc. in 1996 and 1997;
 • Plaintiff's Exhibit 9 Perdue Farms, Inc. Performance Feedback and Appraisal for plaintiff completed on 18 April 1997 (2 pages);
 • Plaintiff's Exhibit 10 Perdue Position Description for "Draw/Display Person" signed by plaintiff and Delois Holloman on 13 February 1996 (2 pages);
 • Plaintiff's Exhibit 11 Job Conditioning Forms (2) dated 8 March and 15 March 1996 for plaintiff, and Perdue Farms, Inc. Departmental Counseling Record for plaintiff dated 28 January 1997 (5 pages);
 • Plaintiff's Exhibit 12 10 September 1998 letter to plaintiff from Perdue concerning exhaustion of her medical leave of absence and employment termination effective on 10 September 1998;
 • Plaintiff's Exhibit 13 128 pages of medical records for the treating physicians at the Perdue Wellness Center in Lewiston, North Carolina (excluding all medical records for treatment provided by Bruce I. Tetalman, M. D.);
 • Plaintiff's Exhibit 15 5 pages of medical records for Dr. J. Thomas Lee;
 • Plaintiff's Exhibit 16 2 pages of medical records for Dr. Denis M. McGillicuddy;
 • Plaintiff's Exhibit 17 X-rays from Roanoke-Chowan Hospital (3 pages);
 • Plaintiff's Exhibit 18 OSHA 200 logs produced by defendants pursuant to court order in this case; and
• Defendant's Exhibit 7 Authorization for Disability Pay.
 *********** RULINGS ON EVIDENTIARY MATTERS
Plaintiff's objection to the Commission's consideration of the videotape set forth in Defendants' Exhibit 2 to the deposition of Alan Gorrod is sustained. That Exhibit is not admitted into evidence, and has not been considered by the Full Commission in this matter.
Plaintiff's objections to the Commission's consideration of the report of Alan Gorrod that is documented in Defendant's Exhibit 1 to the deposition of Alan Gorrod with respect to the jobs that are depicted in the videotape set forth in Defendant's Exhibit 2 and the other job that is referred to in Defendant's Exhibit 1 that defendant has conceded plaintiff never performed are also sustained. That testimony has not been considered by the Full Commission in this matter.
Plaintiff's motion that defendant be required to provide a hearing transcript and that defendant's brief not be considered is DENIED.
 ***********
Based upon all the competent evidence adduced at the hearing, the Full Commission enters the following:
 FINDINGS OF FACT
1. Plaintiff was 57 years old at the time of the hearing before the Deputy Commissioner and has a high school education. Plaintiff held a certificate for cutting hair which has expired. Prior to working for Perdue, plaintiff worked for General Electric for 13 years inspecting parts. Plaintiff began working at Perdue Farms' Lewiston, North Carolina facility on 1 March 1985. She last worked for Perdue on 10 September 1997.
2. Plaintiff originally worked at Perdue in the weigh, price, and label department, where she packed trays and also packed whole birds, known as 805 birds. In packing 805 birds, the birds were on a conveyor line located at plaintiff's waist level, and plaintiff would pick the bird up and put it on a scale to weigh it. The scale was located at plaintiff's armpit level. After the bird was weighed, the scale printed a price label which plaintiff placed on the bird. Plaintiff then placed the bird in a box located on another conveyor belt at plaintiff's waist level. Plaintiff handled 14 birds per minute in this job.
3. When plaintiff was not packing 805 birds, she rotated to a job packing trays. This job required plaintiff to remove trays of chicken from a conveyor belt located at waist height, and place them in a box. The boxes were on another conveyor belt, located at chest level or a little lower on plaintiff. Plaintiff handled 38 to 40 trays a minute. During her time as a packer, plaintiff never saw any physician for any complaints of hand, arm, or shoulder pain.
4. On 19 February 1996, plaintiff transferred to the evisceration department to begin training as a USDA helper/draw hand. The USDA helper and draw hand positions rotated with each other. A USDA helper uses scissors and knives to cut defects off of birds that move along a conveyor line. Only defective birds, as designated by the USDA inspector, were handled. The helper works on a stand and the birds are on shackles located at shoulder lever. Plaintiff would take the bird out of the shackles and place it on a waist level table. At the table, plaintiff would hold the bird in her left hand and cut it with her right hand. The birds traveled on a line at 70 birds per minute. Plaintiff, with the assistance of her trainer, was responsible for half, or 35 of the birds. Plaintiff attempted to trim as many birds as she could, with her trainer taking the birds that plaintiff missed. Plaintiff was never able to completely handle the line.
5. Plaintiff also rotated into the position of a draw hand. As a draw hand, plaintiff reached into the bird with her right hand, her arms extended, and removed the bird's innards. Her left hand held the bird. The conveyor on which plaintiff worked as a draw hand was at a little above her waist level. Plaintiff could sit or stand as necessary. At some point in time which plaintiff cannot recall, she was taken off of both the draw hand and USDA helper jobs. Based on the greater weight of the evidence, plaintiff was taken off the draw hand job on 9 April 1996, but continued working as a USDA helper until 4 June 1996.
6. While training as a USDA helper/draw hand, plaintiff was supervised by Delois Holleman, the foreman in the evisceration department. Ms. Holleman has worked at the Perdue plant for 20 years and has been the assistant foreman or foreman in that department for approximately five years. Holleman supervised plaintiff while plaintiff worked in evisceration. She hired plaintiff into the evisceration department as a USDA helper/draw hand. Plaintiff was never classified as a USDA helper/draw hand because during her 30-day ramp-in program, plaintiff was never able to achieve full performance in either job. During this ramp-in program, plaintiff was paired with another employee who trained her on the job. Holleman observed plaintiff's training and during plaintiff's entire time as a draw hand, plaintiff always worked with a trainer who performed part of the job. After several weeks, Holleman removed plaintiff from the draw hand job because plaintiff was not able to keep up with the draw hand job. Holleman made this decision based on plaintiff's inability to perform the job and not based on any medical restrictions. Plaintiff did not perform the draw hand job after she was removed by Holleman. After plaintiff was removed from the draw hand position, she continued to perform the USDA helper job until 4 June 1996.
7. On 9 April 1996, plaintiff presented to Dr. Robert Hansen, a neurologist at Perdue's Wellness Center. Plaintiff was complaining of right hand, arm, and shoulder pain. The medical records relate that approximately one and a half months previously, plaintiff transferred from her weigh, price and label position because she wanted shorter hours. Plaintiff complained that her draw hand job caused most of her problems and that she had pain in her right shoulder and arm. Dr. Hansen's physical examination revealed decreased range of motion in plaintiff's right shoulder and tenderness along her right arm. Dr. Hansen diagnosed possible bilateral median neuropathies. He provided plaintiff with bilateral wrist splints to wear when she was not working, and modified her duties by eliminating the draw hand job until further notice.
8. On 2 May 1996, plaintiff returned to the Wellness Center and was evaluated by Dr. William Doss, a physiatrist who also provided medical services through the Perdue Wellness Center. Plaintiff had been removed from the draw hand job in April and since then she had been working as a USDA helper. Plaintiff again complained of right arm and shoulder pain. Dr. Doss' examination showed normal upper extremity strength, but was noted to have a "positive Tinel's as well as a positive Phalen's particularly on the right." He assessed plaintiff as having "clinical evidence of right carpal tunnel syndrome," prescribed physical therapy, and scheduled an EMG test. Plaintiff had already been taken off the draw hand job, and Dr. Doss recommended that she remain off, but he allowed her to continue to perform the USDA helper job. The EMG test was performed on 10 May 1996 by Dr. Vernon Kirk, and revealed a moderately severe median neuropathy of the right hand and a mild median neuropathy of the left hand. Defendant treated plaintiff's claim as a medical only claim, accepted liability for plaintiff's bilateral carpal tunnel syndrome, and provided plaintiff with medical treatment for this condition at the Wellness Center.
9. Dr. Doss' diagnosis following a 30 May 1996 examination of plaintiff remained unchanged. He opined that plaintiff suffered from bilateral carpal tunnel syndrome, right greater than left. Dr. Doss continued physical therapy and allowed plaintiff to continue as a USDA helper.
10. Plaintiff returned to Dr. Hansen on 4 June 1996. Plaintiff was still working as a USDA helper, but the scissor work was bothering her hands. Plaintiff had developed swelling and redness in various fingers on both hands. Dr. Hansen ordered blood tests and restricted plaintiff's duty to no repetitive motion, regular rotation, and no use of scissors or knives or forceful pinching. Plaintiff was transferred to liver puller, a job that fell more closely within those restrictions.
11. In plaintiff's job as a liver puller, the birds were transported on a conveyor line located at chest level. Plaintiff never worked overhead in this job. Plaintiff would pull down on the livers and position them so that they could be cut properly by the machine. The livers were already out of the bird and only needed to be straightened. The livers weigh less than an ounce and there is no cutting involved. Ms. Holleman also supervised plaintiff on the liver puller job. She confirmed that the conveyor line runs at chest level. She also confirmed that a liver weighs .08 ounces and that there is very little force involved with the job. A liver puller works with both hands at chest level and does not work at shoulder level or above.
12. Plaintiff again saw Dr. Hansen on 11 June 1996. Dr. Hansen's records revealed new symptoms of right hip pain, which radiated and produced numbness into her right leg. The lab results were unremarkable. Dr. Hansen restricted plaintiff to no sorting, light lifting only, no repetitive motion and no moderate lifting with the right hand. He also found that plaintiff could use her left hand, except that her use of scissors was limited to one hour in the morning and one hour in the afternoon.
13. Plaintiff returned to Dr. Hansen for her hip pain on 25 June 1996, and he referred her to an oncologist due to her history of breast cancer. Plaintiff saw Dr. Doss on 27 June 1996, and he noted that plaintiff had minimal hand complaints. Dr. Doss continued her restrictions and told plaintiff to follow up with him as needed.
14. Plaintiff returned to Dr. Hansen on 23 July 1996, for her bilateral carpal tunnel syndrome, a new symptom of back pain, and a knot in her back, which had been present for the past two weeks. Dr. Hansen's examination revealed unchanged hand symptoms, full range of motion of the shoulders, and tenderness in the trapezius muscles. He diagnosed bilateral carpal tunnel syndrome and a trapezius muscle strain. He continued her restrictions and prescribed physical therapy for the muscle strain.
15. Plaintiff saw Dr. Doss on 25 July 1996. Her medical records revealed that she had been switched over to pulling livers only. He increased her medication and continued her job duties.
16. Plaintiff presented to Dr. Hansen on 13 August 1996. Her examination revealed tenderness over the right scapula and lower rib cage, with full range of motion of the upper extremities and overuse muscle strain of the right trapezius. X-rays were requested, but Dr. Hansen made no diagnosis involving the back or shoulder. Dr. Hansen continued plaintiff's job duties.
17. Plaintiff returned to Dr. Doss on 29 August 1996. Dr. Doss diagnosed persistent low back pain and ordered a thoracic x-ray. He rendered no opinion as to the cause of these problems. Dr. Doss wanted to obtain an evaluation of plaintiff's back as she had persistent mid thoracic pain for at least several months and wanted a surgical referral to Dr. Robert Hansen for a carpal tunnel release as her moderately severe carpal tunnel syndrome had not responded well to conservative treatment. The thoracic x-rays were read as normal at plaintiff's 11 September 1996 visit with Dr. Hansen. In addition, plaintiff's right thoracic pain and upper lumbar pain progressed to right shoulder pain in the preceding two weeks, and plaintiff was unable to lift her right shoulder. Dr. Hansen ordered right shoulder x-rays and a lumbar x-ray.
18. Plaintiff returned to Dr. Hansen on 16 September 1996. Plaintiff was complaining of pain in her hands, which Dr. Hansen felt had "been very appropriately treated with job modification, splinting, and non-steroidal medication." Dr. Hansen prescribed topical cream and vitamin B6 and offered plaintiff cold laser treatments, three times a week for a month. Plaintiff underwent one laser treatment and decided against continuing further treatment.
19. Plaintiff saw Dr. Hansen again on 7 October 1996. She continued to complain of aching and numbness in her fingers, as well as pain between her shoulder blades. The physical examination revealed tenderness between the shoulder blades. Dr. Hansen felt plaintiff's condition was stable and reiterated that plaintiff should not work as a draw hand, but could work in the grading, packing, or pulling livers. Dr. Hansen also indicated that plaintiff's hand complaints were aggravated by persistent repetitive motion and recommended that plaintiff be allowed to rotate every two hours. This rotation was not done.
20. Plaintiff returned to Dr. Hansen on 20 December 1996, for neck, shoulder, and arm pain. Plaintiff reported that her pain was mostly in her neck and between her shoulder blades, with pain in her hands. At this visit, Dr. Hansen opined that plaintiff was symptomatic primarily for fibromyalgia. He requested a repeat EMG and continued her restrictions.
21. The repeat EMG study was performed on 13 February 1997, by Dr. Kirk. The study showed moderately severe median neuropathies bilaterally, which when compared to the previous study, revealed electrophysiologic worsening on the left and mild physiologic improvement on the right. Plaintiff continued to work as a liver puller without rotation during this time.
22. Plaintiff returned to Dr. Hansen on 20 February 1997, stating that her right thoracic pain had intensified. Dr. Hansen related the normal diagnostic studies of plaintiff's thoracic area and ordered an abdominal CT scan because of prior epigastric discomfort. This test provided questionable results and an ultrasound evaluation was recommended, so Dr. Hansen ordered an ultrasound of plaintiff's kidneys and liver. The ultrasound showed cystic lesions in the liver and in each kidney. Thus, on 12 March 1997, Dr. Hansen referred plaintiff to an oncologist, based on these results and her prior history of cancer.
23. Dr. Hansen again saw plaintiff on 24 March 1997. He noted that plaintiff was working pulling livers. Dr. Hansen opined that based on the EMG results, plaintiff's carpal tunnel syndrome was quiescent and responding to treatment. He continued plaintiff's modified duties; however, plaintiff continued to experience symptoms in her hands.
24. Plaintiff was evaluated by Dr. J. Thomas Lee, an oncologist, on 26 March 1997, on referral by Dr. Hansen. Plaintiff had previously seen Dr. Lee for evaluation of thalassemia minor in July 1996, with no complaints of hand, arm, or shoulder pain at that time. In March 1997, plaintiff complained to Dr. Lee of upper right back discomfort adjacent to her scapula. The examination revealed tenderness medial to the right scapula and up to her neck. Dr. Lee diagnosed musculoskeletal back pain, probably related to job activities, and thalassemia minor. He prescribed pain medication, lab tests, and further evaluation by a rheumatologist if the pain persists. He was of the opinion that plaintiff did not have a recurrence of breast cancer.
25. Plaintiff returned to Dr. Lee on 28 May 1997. He read her lab results as normal. Dr. Lee diagnosed right posterior chest/back pain, with normal studies, and thalassemia minor. He reiterated that plaintiff did not have a recurrence of cancer, recommended a rheumatology evaluation, and released plaintiff from his care. Dr. Lee did not restrict plaintiff from work or remove her from work, nor did he treat plaintiff for any problems with her shoulders.
26. Plaintiff was evaluated by Dr. Hansen on 7 August 1997, in follow up for her back pain, which was quite severe. Dr. Hansen reviewed plaintiff's normal diagnostic tests. As a result, he referred her to Dr. Bruce Tetalman, a physiatrist, for evaluation. Plaintiff did not see Dr. Hansen or Dr. Doss after this date. Dr. Hansen and Dr. Doss did not remove plaintiff from the liver pulling job. However, their recommendation for rotation was not followed. Neither Dr. Hanson nor Dr. Doss related plaintiff's shoulder, trapezius, or thoracic pain to her work at Perdue.
27. In the interim, plaintiff was seen by Dr. Newton, a gastroenterologist, on referral from Dr. Hansen, on 20 August 1997. Plaintiff complained of a two-year history of pain in the right scapula area. Dr. Newton diagnosed thoracic back pain, and bilateral carpal tunnel syndrome. Dr. Newton recommended a rheumatology consult. He did not remove plaintiff from work and only saw plaintiff on this date.
28. Plaintiff first saw Dr. Bruce Tetalman, a board-certified physical medicine and rehabilitation doctor and a board certified electromyagrapher and electrodiagnostician, on 10 September 1997. Dr. Tetalman previously worked for Southeastern Neurology, an affiliation which ended in March 2000. Since the termination of that employment he no longer provides services at Perdue's Lewiston plant.
29. At the 10 September 1997 visit, Dr. Tetalman had plaintiff's prior medical records available to him. Plaintiff complained of pain in the left shoulder quadrant and into the mid-back. Dr. Tetalman's physical examination revealed tenderness in the axial and trapezius muscles. Dr. Tetalman diagnosed probable fibromyalgia, based on the existence of various tender points, or trigger points, and concurred with Dr. Hansen's finding of fibromyalgia. At this visit, plaintiff requested a medical leave of absence. Dr. Tetalman felt that this was medically appropriate based on plaintiff's diagnosis of fibromyalgia, which Dr. Tetalman was of the opinion was not caused by plaintiff's jobs at Perdue.
30. Dr. Tetalman is familiar with the liver puller job based on viewing the performance of the job at the Lewiston plant. In Dr. Tetalman's opinion, as of 9 September 1997, plaintiff's fibromyalgia rendered her unable to perform that job; however, plaintiff could have performed the liver puller job with her carpal tunnel syndrome, and the job would not cause an aggravation of plaintiff's carpal tunnel syndrome.
31. Plaintiff last worked for Perdue as a liver puller on 10 September 1997. On that date, she was taken out of work by Dr. Tetalman for her non-work related fibromyalgia. Plaintiff began drawing short-term disability benefits from an employer sponsored non-contributory plan.
32. Dr. Tetalman evaluated plaintiff again on 1 October and 29 October 1997. He again diagnosed fibromyalgia. The examination on 29 October 1997, showed that active range of motion of plaintiff's neck and shoulder muscles was limited by pain. However, plaintiff's passive range of motion showed a full range of motion. The reflexes and sensory examination were normal. These findings, in his opinion, were consistent with a diagnosis of fibromyalgia. Dr. Tetalman felt that plaintiff did not have any rotator cuff pathology, which would be expected to limit her passive range of motion. Based on his assessment, Dr. Tetalman diagnosed plaintiff with regional fibromyalgia, or fibromyalgia localized to the area of the shoulder girdle. Dr. Tetalman would not have recommended that plaintiff undergo carpal tunnel surgery at that time. In his opinion not all conservative care had been exhausted and trauma from surgery might worsen plaintiff's fibromyalgia as her fibromyalgia had not stabilized.
33. Dr. Tetalman evaluated plaintiff again on 19 November 1997, following plaintiff's carpal tunnel syndrome surgery with Dr. Lawrence Morales, and ordered repeat EMG studies. Dr. Tetalman continued plaintiff out of work for non-work related reasons. EMG studies were performed on 11 December 1997, and revealed mild bilateral median neuropathies and compared to the studies of February 1997, there was electrophysiologic improvement bilaterally.
34. At the 17 December 1997 examination, in addition to fibromyalgia and post carpal tunnel syndrome release surgery, Dr. Tetalman diagnosed a possible mild rotator cuff tendonitis. Prior to this, Dr. Tetalman found no evidence of rotator cuff tendonitis. In Dr. Tetalman's opinion, because this condition developed while plaintiff was not working, he could not determine the cause of the problem, which can occur spontaneously. Dr. Tetalman continued to keep plaintiff out of work based on his diagnosis of non-work related fibromyalgia.
35. On 17 February 1998, Dr. Tetalman referred plaintiff to an orthopedist for evaluation of a possible rotator cuff tear. As a result, on 27 February 1998, Plaintiff was evaluated by Dr. Dennis McGillicuddy, an orthopedist. Dr. McGillicuddy's examination revealed tenderness about the scapula and shoulder, but full range of motion of the shoulder with no signs of impingement. Neurovascular examination and motor functions were normal. Dr. McGillicuddy's impression was that plaintiff had mild osteoarthritis of the cervical and lumbar spine with perhaps mild supraspinatus tendonitis. He injected the subacranial space to help her shoulder, but did not think the injection would help her complaints of scapular pain. Dr. McGillicuddy offered no opinion as to causation of the problems for which he treated plaintiff. Dr. Tetalman reviewed Dr. McGillicuddy's examination findings and felt they were consistent with his findings.
36. Dr. Tetalman continued to see plaintiff on a monthly basis from April 1998 through 9 September 1998. During that time, plaintiff's examination remained stable. Dr. Tetalman never was able to determine with medical certainty the pathology affecting plaintiff's shoulder, although he suspected it was fibromyalgia. Dr. Tetalman could find no basis on which to perform shoulder surgery on plaintiff. Plaintiff was terminated from employment on 10 September 1998, after being out of work on medical leave for a year. Plaintiff was last treated by Dr. Tetalman on 9 September 1998.
37. Dr. Tetalman was of the opinion that plaintiff's fibromyalgia and shoulder condition were not caused by her work at Perdue and that plaintiff's jobs at Perdue did not place plaintiff at an increased risk of developing these shoulder conditions as compared to members of the general public not so employed.
38. On 8 October 1997, after plaintiff left Perdue on a medical leave of absence, plaintiff began seeing Dr. Lawrence Morales, a board-certified orthopedist from Norfolk, Virginia. Plaintiff was referred to Dr. Morales by a friend. She was not referred by any physician at Perdue's Wellness Center or by Crawford Company, Perdue's servicing agent. Plaintiff did not seek authorization to see Dr. Morales from anyone at Perdue prior to her visit. The only person at Perdue plaintiff talked to about surgery beforehand was the person who handled health insurance claims for Perdue, to discuss health insurance benefits. Plaintiff did not seek permission from the Industrial Commission to utilize Dr. Morales prior to her surgery.
39. At the initial 8 October 1997 visit with Dr. Morales, plaintiff was complaining of bilateral hand pain and numbness, right shoulder pain and severe low back pain radiating into her legs. Dr. Morales recommended plaintiff discontinue her work and referred her to a diagnostic center for a lumbar MRI and MRIs of both wrists. A third EMG study performed on 13 October 1997 continued to reveal moderate median neuropathies bilaterally despite conservative treatment for almost one and one half years and job modifications.
40. At plaintiff's return visit on 17 October 1997, Dr. Morales read the lumbar MRI to reveal a compression fracture at T11, which would give pain with prolonged sitting, bending, stooping, pushing or pulling. In addition to her continued hand complaints, plaintiff also had diffuse myofascitis around the right shoulder and parascapular area, which he injected. Based on these shoulder complaints, Dr. Morales ordered an MRI of the right shoulder. The MRI, done on 17 October 1997, ruled out a rotator cuff tear which Dr. Tetalman had suspected, but showed tenosynovitis.
41. Dr. Morales examined plaintiff again on 3 November 1997. At that time, following a month of conservative care and a prior year and a half of unsuccessful conservative care at Perdue's Wellness Center in addition to multiple nerve conduction studies, he recommended plaintiff undergo carpal tunnel release surgery. Dr. Morales performed a right carpal tunnel release on plaintiff on 17 November 1997, which revealed that plaintiff's median nerve was markedly compressed. Dr. Morales was of the opinion that within six to eight weeks of her carpal tunnel syndrome release, plaintiff would have been able to return to gainful employment, from the standpoint of her hands, with the only restrictions of no repetitive motion and no overhead activity. Dr. Morales opined that plaintiff's job duties with defendant caused her carpal tunnel syndrome and placed her at an increased risk of developing carpal tunnel syndrome. Dr. Morales' opinions regarding causation and increased risk as to plaintiff's shoulder condition are given no weight as they were based upon a hypothetical that assumed facts contradicted by the evidence of record.
42. Plaintiff returned to Dr. Morales postoperatively on 1 December 1997. Dr. Morales stated that if her right shoulder problem persisted she may consider an arthroscopic decompression. He also found diffuse tenderness in the interthoracic area, which he felt was consistent with a diagnosis of fibromyalgia.
43. Dr. Morales again recommended arthroscopic shoulder surgery at a 12 February 1998 examination of plaintiff. He did not evaluate plaintiff again until 12 February 1999, one year later. At that time, he noted that plaintiff was happy with the results of her carpal tunnel syndrome surgery, but was still symptomatic in her right shoulder. He again recommended shoulder surgery. This examination remained unchanged in his 7 May 1999 examination and his last examination of plaintiff on 13 September 1999. Dr. Morales agreed that a person who did not work at shoulder level or above would not be predisposed to developing shoulder problems.
44. On 11 July 2000, plaintiff underwent an independent medical evaluation with Dr. Carol Epling at plaintiff's request. Dr. Epling is board-certified in internal medicine and occupational and environmental medicine. Dr. Epling has not seen any of the jobs performed by plaintiff at Perdue Farms. Dr. Epling's findings and conclusions are stated in an office note dated 3 August 2000, which was based upon her 11 July 2000 examination of plaintiff.
45. Dr. Epling's musculoskeletal examination showed a full active range of motion for plaintiff's right and left shoulders. Plaintiff had normal examinations of both elbows. Her right wrist had a well-healed surgical scar and negative nerve compression tests and was not symptomatic for carpal tunnel syndrome. The left wrist had no swelling and negative nerve compression tests. Dr. Epling diagnosed bilateral carpal tunnel syndrome, right shoulder pain due to rhomboid inflammation, osteoarthritis, and a T11 compression fracture.
46. Dr. Epling could not say that plaintiff's jobs at Perdue probably caused her rhomboid inflammation. Dr. Epling was not able to attribute any rhomboid inflammation, after plaintiff stopped working in September 1997, to plaintiff's work at Perdue, and could not say what was causing the ongoing inflammation but did not believe it was attributable to plaintiff's work at Perdue. Dr. Epling also testified that the rhomboid inflammation could increase with any full range motion of the shoulder or could "flare without a known event."
47. Dr. Epling was of the opinion that when she evaluated plaintiff, any supraspinatus tendonitis in plaintiff's right shoulder, which plaintiff may have had previously, was resolved. Dr. Epling found no condition of the right shoulder which would require surgery, stating that when she evaluated plaintiff, her shoulder exam was normal and any shoulder problems had resolved. In the 3 August 2000 office note, Dr. Epling found that plaintiff had reached maximum medical improvement for bilateral occupational carpal tunnel syndrome, and she assigned a 7% PPD rating to the right hand and a 5% PPD rating to the left hand based on plaintiff's carpal tunnel syndrome. As to plaintiff's supraspinatus tendonitis and rhomboid inflammation, Dr. Epling felt that the tendonitis had resolved and the ongoing rhomboid inflammation was non-occupational, so no PPD ratings were appropriate.
48. Based upon the description of plaintiff's jobs and the way plaintiff performed them as indicated by plaintiff's own testimony at the hearing, Dr. Epling was of the opinion that plaintiff's shoulder conditions, the supraspinatus tendonitis and rhomboid inflammation, were not related to plaintiff's jobs at Perdue. Dr. Epling also opined that plaintiff's job duties with defendant were the cause of her carpal tunnel syndrome, and that her job placed her at a greater risk than that of the general public of contracting carpal tunnel syndrome.
49. Plaintiff contracted bilateral carpal tunnel syndrome on or about 5 April 1996.
50. Plaintiff's bilateral carpal tunnel syndrome was proximately caused by her regular work duties as a USDA helper/draw hand and packer in the course of her employment with defendant-employer.
51. Plaintiff's job duties as a USDA helper/draw hand and packer placed her at an increased risk of contracting bilateral carpal tunnel syndrome than members of the general public not so employed.
52. Although plaintiff was taken out work on 10 September 1997 due to complaints in the shoulder area, plaintiff was also continuing to experience considerable pain and numbness in both hands and musculoskeletal pain in the right thoracic area of her back. Plaintiff had been allowed under the restrictions imposed by Dr. Hansen on 7 October 1996 to work in the liver pulling position with rotation to accommodate her carpal tunnel syndrome. Plaintiff was never provided rotation in the liver puller position as required by her doctor and she continued to experience significant hand pain. Thus, plaintiff was not given work within her restrictions. Even though plaintiff was written out of work on 10 September 1997 for her shoulder problems, her inability to work was also due to her bilateral carpal tunnel syndrome which, as she was not given suitable work within her restrictions, continued to be symptomatic and caused plaintiff considerable pain.
53. Plaintiff did not perform duties above her head or above shoulder level while employed with Perdue. The medical evidence indicating that plaintiff's shoulder tendonitis was caused by her job duties at Perdue is not deemed credible as that testimony was based upon the assumption of facts which were not in evidence and were indeed contrary to plaintiff's own testimony. This testimony assumed that plaintiff performed overhead work, but plaintiff did not perform overhead work.
54. Plaintiff did contract right shoulder tendonitis; however, that condition was not proximately caused by her employment at Perdue. In addition, plaintiff's employment with Perdue did not contribute to her right tendonitis as she did not frequently raise her arm above shoulder height according to her own testimony.
55. Plaintiff's rhomboid inflammation was not caused by her employment with defendant-employer. Plaintiff did not perform jobs requiring lifting and reaching above her shoulder for consistent periods of time as indicated by her own testimony and therefore plaintiff's rhomboid inflammation was not aggravated by her employment with Perdue. Plaintiff's rhomboid inflammation was not caused by or aggravated by her employment with Perdue. By August 2000 plaintiff's shoulder tendonitis had completely resolved and any occupational involvement, had there been any, with plaintiff's rhomboid inflammation had also completely resolved.
56. Those portions of the testimony and opinions of Dr. Tetalman that are based upon the jobs that are depicted in the videotape exhibit marked as Defendant's Exhibit 2 for the deposition of Mr. Gorrod are given no weight by the Full Commission. Defendant has not laid the proper foundation to show that plaintiff actually performed either of the jobs that are depicted in that videotape. Further, the opinions of Dr. Gorrod regarding jobs referred to in Defendant's Exhibit 1 and depicted in Defendant's Exhibit 2 videotape, are given no weight by the Full Commission as defendant has conceded that plaintiff never performed those jobs.
57. Plaintiff's retains a 7% permanent partial impairment of her right hand and a 5% permanent partial impairment of her left hand as a direct and proximate result of her employment with defendant-employer and the resulting contraction of bilateral carpal tunnel syndrome. Plaintiff does not retain any work related permanent injury to her shoulder.
58. Plaintiff has a restriction of no repetitive work with her hands. The jobs which plaintiff performed at Perdue were highly hand repetitive. There is evidence that when she was performing the liver puller job which was considered light work her bilateral carpal tunnel syndrome continued to worsen. Dr. Epling expressed concern over plaintiff performing this job. The liver puller job is not suitable for plaintiff.
59. Plaintiff had reached maximum medical improvement physically for her carpal tunnel syndrome on 11 July 2000, approximately one month after the hearing in this matter but before the record closed for submission of medical evidence on 18 September 2000; however, plaintiff continues to experience pain and tingling in her hands as a result of her carpal tunnel syndrome, and remains under restrictions prohibiting repetitive work with her hands. Plaintiff has not had an opportunity to present evidence on whether her disability continued after she reached maximum medical improvement.
60. From 10 September 1997 and continuing at least until she reached maximum medical improvement, plaintiff was incapable of earning wages which she was receiving at the time of her contraction of bilateral carpal tunnel syndrome in the same or in any other employment.
61. Plaintiff's treatment by Dr. Morales was necessary and reasonably designed to effect a cure, give relief or lessen the period of disability and, indeed, did so. The physicians obtained by defendant to treat plaintiff had repeatedly failed to successfully treat her carpal tunnel syndrome and continued to return her to work in a repetitive position which aggravated her condition. When plaintiff was forced to take a leave of absence from work due to her shoulder condition and bilateral carpal tunnel syndrome, the treating physician found her disabled due to non work related fibromyalgia. As of 10 September 1997 defendant was denying plaintiff had any disability relating to her carpal tunnel syndrome. Defendant officially denied plaintiff's claim for disability due to carpal tunnel syndrome in writing on a Form 61 Denial of Workers' Compensation Claim dated 3 August 1999. As plaintiff's carpal tunnel condition continued, rendering her unable to perform her employment duties, it was reasonable for her to seek further treatment from a physician of her own choosing and defendant has no right to direct medical treatment for a denied claim. Even if plaintiff were required to seek Commission approval for treatment by Dr. Morales, defendant had notice of plaintiff's treatment from Dr. Morales and defendant was not prejudiced by plaintiff's failure to seek permission for treatment. Plaintiff's request for approval of the Industrial Commission of her treatment by Dr. Morales was made within a reasonable time.
 ***********
Based upon the foregoing stipulations and findings of fact, the Full Commission enters the following:
 CONCLUSIONS OF LAW
1. Plaintiff has established that she contracted bilateral carpal tunnel syndrome, an occupational disease, on or about 5 April 1996. At that time plaintiff earned an average weekly wage of $274.77, yielding a compensation rate of $183.19. N.C. Gen. Stat. § 97-53(13); N.C. Gen. Stat. § 97-2(5).
2. Plaintiff's bilateral carpal tunnel syndrome was proximately caused by her regular work duties as a USDA helper/draw hand and packer in the course of her employment with defendant-employer. N.C. Gen. Stat. §97-53(13).
3. Plaintiff's job duties as a USDA helper/draw hand and packer placed her at an increased risk of contracting bilateral carpal tunnel syndrome than members of the general public not so employed. N.C. Gen. Stat. § 97-53(13).
4. Although plaintiff was not taken out of work due to her carpal tunnel syndrome, plaintiff's leave of absence was necessitated in significant part by her carpal tunnel syndrome, combined with her shoulder condition. Plaintiff had been allowed under the restrictions imposed by Dr. Hansen on 7 October 1996 to work in the liver pulling position with rotation to accommodate her carpal tunnel syndrome. Plaintiff was never provided rotation in the liver puller position as required by her doctor and she continued to experience significant hand pain. Thus, plaintiff was not given work within her restrictions. Although plaintiff was written out of work on 10 September 1997 for her shoulder problems, as she was not given suitable work within her restrictions, her inability to work was also due to her bilateral carpal tunnel syndrome which continued to be symptomatic and caused plaintiff considerable pain. Accordingly, plaintiff has established disability as a result of her compensable occupational disease of carpal tunnel syndrome. N.C. Gen. Stat. § 97-52; Russell v. Lowes Prod. Distrib.,108 N.C. App. 762, 425 S.E.2d 454 (1993).
5. Plaintiff did not perform duties above her head or above shoulder level while employed with Perdue. The medical evidence indicating that plaintiff's shoulder tendonitis was caused by her job duties at Perdue is not deemed credible as that testimony was based upon the assumption of facts which were not in evidence and were indeed contrary to plaintiff's own testimony. This testimony assumed that plaintiff performed overhead work, but plaintiff did not perform overhead work. N.C. Gen. Stat. § 97-53(13).
6. Plaintiff did contract right shoulder tendonitis; however, that condition was not proximately caused by her employment at Perdue. In addition, plaintiff's employment with Perdue did not contribute to her right tendonitis as she did not frequently raise her arm above shoulder height according to her own testimony. Therefore, this condition is not compensable under the Act. N.C. Gen. Stat. § 97-53(13).
7. Plaintiff's rhomboid inflammation was not caused by her employment with defendant-employer. Plaintiff did not perform jobs requiring lifting and reaching above her shoulder for consistent periods of time as indicated by her own testimony and therefore plaintiff's rhomboid inflammation was not aggravated by her employment with Perdue. Plaintiff's rhomboid inflammation was not caused by or aggravated by her employment with Perdue. By August 2000 plaintiff's shoulder tendonitis had completely resolved and any occupational involvement, had there been any, with plaintiff's rhomboid inflammation had also completely resolved and thus is not compensable. N.C. Gen. Stat. § 97-53(13).
8. Plaintiff reached maximum medical improvement on 11 July 2000, and she retains a 7% permanent partial impairment of her right hand and a 5% permanent partial impairment of her left hand as a direct and proximate result of her employment with defendant-employer and the resulting contraction bilateral carpal tunnel syndrome. N.C. Gen. Stat. § 97-31.
9. Plaintiff has restriction of no repetitive work with her hands. The jobs which plaintiff performed at Perdue were highly repetitive. There is evidence that when she was performing the liver puller job which was considered light work her bilateral carpal tunnel syndrome continued to worsen. Because the liver puller job requires repetitive movement which aggravated plaintiff's condition, it is not appropriate for plaintiff and does not constitute an offer of suitable employment on the part of defendant. N.C. Gen. Stat. § 97-29.
10. Plaintiff has established disability resulting from her compensable occupational disease; however, because there was no opportunity for plaintiff to present evidence that her disability continues beyond the 11 July 2000 date of maximum medical improvement from her carpal tunnel syndrome, plaintiff's eligibility for temporary total disability compensation ends on 11 July 2000. A further hearing is required to establish whether plaintiff remained totally disabled after 11 July 2000. Plaintiff would benefit from vocational rehabilitation. N.C. Gen. Stat. § 97-29.
11. From 10 September 1997 to at least 11 July 2000 when she reached maximum medical improvement, plaintiff was incapable of earning wages which she was receiving at the time of her contraction of bilateral carpal tunnel syndrome at the same or in any other employment. Plaintiff is entitled to temporary total disability compensation during this period. N.C. Gen. Stat. § 97-29.
12. Plaintiff's treatment by Dr. Morales was necessary and reasonably designed to effect a cure, give relief or lessen the period of disability and, indeed, did so. Plaintiff requested treatment by Dr. Morales within a reasonable time and Dr. Morales is authorized as a treating physician for plaintiff.
13. Defendant paid disability pay to plaintiff pursuant to an employer-funded, non-contributory disability plan. These funds were not due and payable at the time made and defendant is entitled to a deduction in the amount paid pursuant to the plan. N.C. Gen. Stat. § 97-42;Johnson v. IBM, Inc., 97 N.C. App. 493, 389 S.E.2d 121, disc. reviewdenied, 327 N.C. 429, 395 S.E.2d 679 (1990).
14. The issue of whether plaintiff's disability continued after she reached maximum medical improvement on 11 July 2000 is hereby reserved and may be presented before a deputy commissioner upon motion by either party. If plaintiff's period of disability ended upon the date of maximum medical improvement, she is eligible for disability compensation in the amount of $183.19 per week for 24 weeks pursuant to the permanent partial disability ratings for her hands. N.C. Gen. Stat. § 97-31(12). Should plaintiff prove disability continuing beyond the date of maximum medical improvement, she is entitled to elect the more favorable remedy between continuing disability compensation and compensation pursuant to the ratings. Gupton v. Builders Transp., 320 N.C. 38, 357 S.E.2d 674
(1987).
 ***********
Based upon the foregoing stipulations, findings of fact and conclusions of law, the Full Commission enters the following:
 AWARD
1. For her compensable bilateral carpal tunnel syndrome, defendant shall pay temporary total disability compensation to plaintiff at the rate of $183.19 per week from 10 September 1997 through the date of maximum medical improvement on 11 July 2000, subject to the deduction by defendant of the amounts paid pursuant to the employer-funded disability plan. Portions of this amount have accrued and shall be paid in a lump sum. These amounts shall be paid subject to an attorney's fee contained in Paragraph 2.
2. Should plaintiff's disability be determined to end as of the date of maximum medical improvement, defendant shall pay plaintiff $4,396.56 in compensation for the permanent partial disability ratings of plaintiff's hands.
3. A reasonable attorney's fee of 25% of the compensation due under Paragraphs 1 and 2 of this Award is approved for plaintiff's counsel and shall be paid as follows: one fourth of the lump sum due to plaintiff shall be deducted by defendant and paid directly to plaintiff's counsel.
4. Dr. Morales is authorized as plaintiff's treating physician for her bilateral carpal tunnel syndrome only.
5. Defendant shall pay all medical expenses incurred or to be incurred in the future by plaintiff as a result of her compensable bilateral carpal tunnel syndrome including those as a result of services performed by Dr. Morales.
6. Defendant shall pay the costs.
This the ___ day of October, 2001.
 S/___________________ BERNADINE S. BALLANCE COMMISSIONER
CONCURRING:
 S/_____________ THOMAS J. BOLCH COMMISSIONER
 S/______________ RENE C. RIGGSBEE COMMISSIONER